AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original



**LODGED**
CLERK, U.S. DISTRICT COURT
6/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

**FILED**
CLERK, U.S. DISTRICT COURT
06/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ IV _____ DEPUTY

for the

Central District of California

United States of America

v.

PAUL RICHARD RANDALL,

Defendant.

Case No.   2:25-MJ-03689-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

[18 U.S.C. §§ 1347, 2]

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about October 11, 2022, in Los Angeles and San Bernardino Counties and elsewhere, defendant PAUL RICHARD RANDALL, together with others, each aiding and abetting one another, did knowingly and willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, that is Medicaid of California ("Medi-Cal"), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing to be submitted a false and fraudulent claim from Monte Vista Pharmacy to Medi-Cal, namely claim number 51250479201 for beneficiary K.R. for Meloxicam 5 mg capsule, prescribed by Patricia Anderson, for which Monta Vista Pharmacy billed Medi-Cal approximately $13,424.45, in violation of 18 U.S.C. §§ 1347, 2.

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Elaine Wong*
*Complainant's signature*

Elaine Wong, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     June 17, 2025

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Roger Hsieh x0600
DOJ Trial Attorney Siobhan Namazi (202) ▮▮▮▮

## **Table of Contents**

I.    INTRODUCTION.............................................. 1

II.   PURPOSE OF AFFIDAVIT...................................... 1

III.  SUMMARY OF PROBABLE CAUSE................................. 3

IV.   STATEMENT OF PROBABLE CAUSE.............................. 6

      A.    RELEVANT INDIVIDUALS AND ENTITIES....................6

      B.    RANDALL, MEKAIL, AND ANDERSON's MEDI-CAL FRAUD SCHEME.7

            1.    Background on the Medi-Cal Program..........7

            2.    The Scheme to Defraud.......................9

            3.    Medi-Cal Enrollment Records and Claims Data
                  ...........................................12

            4.    DHCS Investigation of Monte Vista and Onsite
                  Visit.......................................14

            5.    Mekail's Statements.........................16

            6.    Anderson's Statements.......................18

            7.    Email and Fax Records.......................20

            8.    Phone Records...............................23

            9.    Medi-Cal Beneficiary Interviews.............24

            10.   Interviews with Former Monte Vista Employees
                  ...........................................28

            11.   Financial Analysis..........................31

            12.   ███████████████████████.................35

V.    CONCLUSION.............................................. 35

i

**AFFIDAVIT**

I, Elaine Wong, being duly sworn, declare and state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the FBI and have been so employed since February 2013.  I am currently assigned to a white-collar crime squad, Los Angeles Field Office, West Covina Resident Agency, which is responsible for investigating complex financial crimes, including health care fraud.

2.    Since becoming an FBI Special Agent, I received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia, as well as additional training courses related to criminal and counterintelligence investigations.  In addition, I have received training in financial analysis and identification of fraudulent financial activity both in Quantico and elsewhere.  During my time with the FBI, I have participated in numerous investigations regarding health care fraud.  I have participated in many aspects of criminal investigations, including reviewing evidence, conducting physical surveillance, and the execution of search, arrest, and seizure warrants.  Additionally, I have interviewed witnesses and victims who had personal knowledge regarding the investigations in which I have been involved.

## II.   PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint against, and an arrest warrant for, Paul Richard Randall ("RANDALL"), for committing a violation of 18 U.S.C.

§§ 1347 (health care fraud), 2 (aiding and abetting), that is on or about the date below, in the Central District of California and elsewhere, RANDALL, together with others, each aiding and abetting on another, did knowingly and willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicaid of California, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, namely:

| DATE | BENEF-ICIARY | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|------|------|------|------|------|------|
| 10/11/22 | K.R. | 512504 79201 | Meloxicam 5 mg capsule | Anderson | $13,424.45 |

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance

and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

5.   I am investigating this case with other law enforcement officers, including Special Agents John Stewart and Jim Nguyen with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and Special Agent Khanhvan Le with the California Department of Justice. The facts set forth in this affidavit are based upon my personal observations, my training and experience, the review of documents and records that were collected during this investigation, information that was obtained from interviewed witnesses, and information obtained and relayed to me by HHS-OIG Special Agents Stewart and Nguyen, Special Agent Le, other members of the investigative team, and others as described below.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   As detailed below, RANDALL, Kyrollos Mekail ("Mekail"), Patricia Anderson ("Anderson"), and others submitted and caused to be submitted approximately $269 million in false claims in just 11 months to Medicaid of California ("Medi-Cal") through Monte VP LLC, doing business as Monte Vista Pharmacy ("Monte Vista") for expensive prescription drugs containing generic ingredients that were not medically necessary and, in many instances, not provided to the purported recipients.  The medications at issue contained cheap, generic ingredients but which were manufactured in unique dosages, combinations, or package quantities, and so were not included in the applicable

3

maximum price lists that cap Medi-Cal reimbursements (the "non-contracted, generic drugs"). Medi-Cal normally requires prior authorization before it pays a pharmacy for dispensing non-contracted, generic drugs. However, in February 2022, Medi-Cal announced it had temporarily suspended the prior authorization requirement, retroactive to January 2022, in an attempt to maximize access to patient care during a program transition.

7.  Taking advantage of Medi-Cal's temporary suspension of the prior authorization requirement, Monte Vista's claims to Medi-Cal for dispensing non-contracted, generic drugs jumped from an average of tens of thousands of dollars per month, to tens of millions of dollars per month. Over 85 percent of the drugs billed to Medi-Cal by Monte Vista were purportedly prescribed by Anderson, a nurse practitioner. Interviews of Anderson as well as texts, faxes, emails, and bank records involving RANDALL and Anderson confirm that she was paid illegal kickbacks by RANDALL to sign prescriptions for the medications without ever evaluating the patients or assessing the medical necessity of those drugs. Interviews of patients billed by Monte Vista confirmed that the patients had never been seen by Anderson and that the drugs were not medically necessary and often not received by the patients. Further, an audit of Monte Vista by the California Department of Health Care Services revealed Monte Vista had billed for drugs it never dispensed and had billed for dispensing more drugs than it had actually purchased from wholesalers. From May 2022, and continuing through April 2023, Monte Vista billed Medi-Cal over $269

4

million and in turn was paid over $178 million for nineteen expensive, non-contracted drugs containing low-cost, generic ingredients that were not medically necessary, not provided, or both.

8.   In addition, RANDALL, and others laundered the proceeds of the fraud scheme through first- and second-level transactions with various individuals, including an individual, A.G., through trust accounts established for the benefit of RANDALL.  My review of bank records as well as other information obtained throughout this investigation confirm that A.G. is RANDALL's attorney.  The evidence shows that RANDALL transferred proceeds of the Medi-Cal fraud scheme to A.G. in order to pay kickbacks to Anderson, to promote the fraud scheme and to conceal and disguise the transfers from detection by law enforcement.

9.   ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
███████    ██████████████████████████████
██████████████████████████████████████
████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████. As set forth below, in addition to other evidence such as claims data, bank records, and interview reports, evidence seized

███████████████████████ corroborates RANDALL's participation in the Medi-Cal fraud scheme.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports and other documents, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following facts and information.

## A. RELEVANT INDIVIDUALS AND ENTITIES

11. RANDALL, a resident of Orange County, California, is a patient marketer.

12. MONTE VP LLC d/b/a Monte Vista Pharmacy ("Monte Vista") is a pharmacy located in San Bernadino County, California.

13. MHS LLC ("MHS") is a California company owned by RANDALL's attorney A.G. RANDALL purported to work for MHS.

14. RANDALL controlled several trust accounts under the name SOCAL Family Irrevocable Trust ("SOCAL Trust"), all of which were established for RANDALL's benefit. SOCAL Trust held accounts at Wells Fargo Bank and Wells Fargo Advisors with another individual named K.J. as the signatory (collectively, the "SOCAL Trust Accounts").

15. Mekail, a resident of San Bernadino County, California, is the sole owner, CEO/SEC/CFO/Director, and Pharmacist-in-Charge of Monte Vista.

16. Anderson, a resident of Los Angeles County, California, is a nurse practitioner who had an office in Calabasas, California and who worked for MHS. Anderson

6

controlled and was a signatory for two checking accounts at Bank of America (the "Anderson BofA Accounts").

B.    **RANDALL, MEKAIL, AND ANDERSON's MEDI-CAL FRAUD SCHEME**

    1.    <u>Background on the Medi-Cal Program</u>

    17.    Based on my training and experience, conversations with other law enforcement agents, and investigation in this matter, I understand that Medi-Cal is California's Medicaid program, a public health insurance program which provides needed health care services for low-income individuals including families with children, seniors, persons with disabilities, individuals in foster care, pregnant women, and low-income individuals with specific diseases such as tuberculosis, breast cancer, or HIV/AIDS.  Medi-Cal is administered by the State of California and the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medi-Cal is financed equally by the State of California and the federal government, with the federal government's funds provided to Medi-Cal through CMS.  Medi-Cal is a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f). Individuals who receive Medi-Cal benefits are referred to as Medi-Cal "recipients" or "beneficiaries."

    18.    Medi-Cal payments for covered prescriptions are typically made directly to the dispensing pharmacy rather than the recipient because Medi-Cal recipients routinely assign their right to payment to the pharmacy.  Once a Medi-Cal recipient

assigns their right to payment to a pharmacy, the pharmacy then submits its bill directly to Medi-Cal for payment.

19.   All health care providers, including pharmacies, must comply with all applicable statutes, regulations, and guidelines to be reimbursed by Medi-Cal.  Providers have a duty to have knowledge of the relevant statutes, regulations, and guidelines regarding Medi-Cal coverage for prescriptions.

20.   California Department of Health Care Services ("DHCS") contracts with third-party entities to establish and maintain a list of Maximum Allowable Ingredient Cost ("MAICs") for certain generic pharmaceutical drugs.  The purpose of the program is to establish upper-limit generic drug ingredient reimbursement rates that encourage efficient purchasing while being responsive to drug pricing fluctuations.

21.   "Prior authorization" refers to a requirement by health plans, including Medi-Cal at times, for patients to obtain approval for a health care service or medication before the care or medication is provided. Such a system allows the payor to evaluate whether the requested care is medically necessary and otherwise covered before the expenses are incurred.  A prior authorization system is thus an important safeguard against the overprescribing of medications and, accordingly, also important for payors such as Medi-Cal to control costs.

22.   Medi-Cal has traditionally required prior authorization for an array of medications as a condition of reimbursement, including non-contracted, generic drugs.

However, at the beginning of 2022, Medi-Cal temporarily suspended prior authorization requirements for most prescription medications in connection with an ongoing transformation of Medi-Cal's prescription drug program from managed care to fee-for-service, referred to as "Medi-Cal Rx."  In February 2022, Medi-Cal notified providers of the change in prior authorization requirements, which was made retroactive to January 2022.

23.  Monte Vista was a Medi-Cal provider.

2.  <u>The Scheme to Defraud</u>

24.  As detailed below, there is probable cause to believe that from in or around May 2022, and continuing through April 2023, RANDALL, Mekail, Anderson, and others executed a scheme to defraud Medi-Cal by submitting fraudulent claims for reimbursement for prescription drugs that were not medically necessary, not dispensed to Medi-Cal beneficiaries, and/or were procured by illegal kickbacks.

25.  Based on my conversations with other law enforcement officers and review of documents, including Medi-Cal claims data, interview reports, texts, emails, faxes, and bank records, I understand that following Medi-Cal's suspension of prior authorization requirements in February 2022, RANDALL, together with Mekail, Anderson, and others, caused Monte Vista to submit hundreds of millions of dollars in false and fraudulent claims to Medi-Cal for certain non-contracted, generic drugs, including: Chlorzoxazone 375 mg tablet; Crotan 10% lotion; DermacinRx Lidogel 2.8% gel; Diclofenac 2% solution pump; Fenoprofen 400 mg capsule; Folite tablet; Indocin 50 mg

suppository; Lidocaine-Prilocaine 2.5%-2.5% cream; Lidocort 3%-
0.5% cream; Lidotral 3.88% cream; Lofena 25 mg tablet; Meloxicam
5 mg capsule; Naftifine HCL 1% cream; Naproxen-Esomeprazole DR
375-20 mg tablet; Norgesic Forte 50-770-60 mg tablet;
Omeprazole-Sodium Bicarbonate 20-1,680 packet; Oxiconazole
Nitrate 1% cream; Synoflex 4%-5% patch, and DermacinRx Prenatrix
Caplet (collectively, the "Fraud Scheme Medications").

26.   The investigation uncovered that: (1) in or around May
2022, RANDALL[1] and Mekail agreed that RANDALL would refer false

----

[1] Court records show that in 2012, RANDALL pleaded guilty to
an information charging him with conspiracy to commit mail
fraud, in violation of 18 U.S.C. § 371, related to him paying
kickbacks to chiropractors and physicians to refer workers'
compensation patients to Tri-City Regional Medical Center for
spinal surgeries and to his creating invoices falsely inflating
the cost of spinal surgery hardware to be used in the surgeries,
which were then billed to the workers' compensation insurance
carriers.  See United States v. Randall, 8:12-cr-00023-JLS (C.D.
Cal.).  RANDALL was sentenced to a term of 15 months in custody.

On January 15, 2020, RANDALL was charged with three counts
of tax evasion, in violation of 18 U.S.C. § 7201, committed
while on release in the prior mail fraud conspiracy case, in
violation of 18 U.S.C. § 3147.  United States v. Randall, 2:20-
cr-00031-GW.  On January 21, 2020, RANDALL was arrested and
subsequently released on bond with conditions including that "I
will not commit a federal, state, or local crime while during
the period of release.  See id. Dkt. 11.

On April 21, 2022, RANDALL pleaded guilty to one count of
tax evasion, and in the plea agreement stated:

> [D]efendant operated a prescription referral business
> called Pharma Pro Solutions LLC ("Pharma Pro").
> Pharma Pro had a half-dozen or so "marketers" who
> staffed booths at school job fairs, businesses, or
> trade shows to solicit university students and
> employees with health insurance to seek prescriptions
> for expensive and medically unnecessary compounded
> drugs.  As part of a "co-marketing" plan, defendant
> agreed with health care providers, including M.R., to
> refer patients to providers in exchange for the
> providers' writing prescriptions for such medications.

(footnote cont'd on next page)

and fraudulent prescriptions for the Fraud Scheme Medications to Monte Vista so that Monte Vista could submit claims to Medi-Cal for these medications, in exchange for RANDALL receiving approximately 40 percent of Monte Vista's profit from the fraudulent claims associated with prescriptions RANDALL referred; (2) RANDALL used the fraud scheme proceeds to pay kickbacks to Anderson and other prescribers to write prescriptions for the Fraud Scheme Medications, knowing that Anderson and the other prescribers had not seen or evaluated the patient or otherwise determined the medications prescribed were medically necessary; and (3) RANDALL and others laundered the fraud proceeds through other individuals and entities, including the SOCAL Trust Accounts.

27.    A review of Medi-Cal claims data supports that from in or around May 2022 to in or around April 2023, RANDALL, Mekail, Anderson, and others submitted and caused to be submitted over $269 million in false and fraudulent claims to Medi-Cal for purportedly dispensing the Fraud Scheme Medications, on which Medi-Cal paid at least approximately over $178 million.

28.    A review of bank records supports that between approximately May 16, 2022, and November 14, 2023, Mekail and his family members paid RANDALL at least approximately

---

On April 24, 2023, RANDALL was sentenced to 23 months in custody.  Id. Dkt. 84 (minutes of sentencing and judgment).

The facts set forth in this affidavit demonstrate probable cause that RANDALL committed the instant offense of health care fraud, in violation of 18 U.S.C. § 1347, while on release in the tax evasion case.

$32 million in fraud scheme proceeds to the SOCAL Trust Accounts.

29.   A review of bank records supports that between February 2022, and April 2023, RANDALL paid and caused to be paid Anderson at least approximately $285,500 in kickbacks in exchange for prescriptions for the Fraud Scheme Medications.

3.   Medi-Cal Enrollment Records and Claims Data

30.   Medi-Cal enrollment records show that Monte VP LLC and Mekail purchased Monte Vista on or about October 21, 2021. Medi-Cal claims data shows that in December 2021, Monte Vista billed approximately $31,341.54 and was paid approximately $10,652.20 by Medi-Cal.

31.   Medi-Cal claims records show that in or around April 2022, Monte Vista's claims to Medi-Cal jumped from tens of thousands of dollars billed per month in 2021, to tens of millions of dollars billed per month.  In April 2022, Monte Vista billed Medi-Cal approximately $712,619.42 and was paid approximately $275,729.60.  In May 2022, Monte Vista billed Medi-Cal approximately $1,650,000 and was paid approximately $867,000.  In June 2022, Monte Vista billed Medi-Cal approximately $6,410,000 and was paid approximately $4,000,800. In December 2022, Monte Vista billed Medi-Cal approximately $73,197,520.60 and was paid approximately $48,918,660.39.  Monte Vista's billed amount to Medi-Cal increased approximately $73,166,179, or about 233,447 percent, within twelve months.  I understand the chart below shows Monte Vista's increase in Medi-Cal billing from December 2021 to June 2022:



32.    Medi-Cal payments for the Fraud Scheme Medications account for approximately 93 percent of Monte Vista's total revenue from May 2022 to March 2023.  From May 2022 to March 2023, Monte Vista billed over $269 million and was paid over $178 million for purportedly dispensing the Fraud Scheme Medications alone.

33.    Through my research and conversations with others, I understand that the Fraud Scheme Medications all contain cheap, generic ingredients, but were manufactured in unique or idiosyncratic dosages, combinations, or package quantities, and so were not included in the applicable maximum price lists that cap Medi-Cal reimbursements.

13

34.  As such, the Fraud Scheme Medications typically required prior authorization from Medi-Cal before a pharmacy could be paid for dispensing those drugs.  However, as discussed above, in February 2022, Medi-Cal announced it had temporarily suspended the prior authorization requirement, retroactive to January 2022, in an attempt to maximize access to patient care during a program transition.

35.  For example, one of the non-contracted generic drugs billed by Monte Vista was Meloxicam 5 mg.  Through my research and conversations with others, I understand that Meloxicam is a non-steroidal, anti-inflammatory drug used to treat arthritis. Monte Vista began billing for Meloxicam 5 mg in February 2022. According to Medi-Cal claims data, when billing Medi-Cal for a 30-day supply of Meloxicam 7.5 mg tablets, Monte Vista billed approximately $124.06 and was paid $13.52.  By contrast, when billing for a 30-day supply of Meloxicam 5 mg tablets, Monte Vista billed approximately $13,424.45 and was paid $8,956.20.

4.   <u>DHCS Investigation of Monte Vista and Onsite Visit</u>

36.  Through my review of records and conversations with others, I understand that in July 2022, DHCS identified Monte Vista as a high-risk Medi-Cal provider billing for high-cost non-contracted generic drugs.  DHCS further determined that 90% of Monte Vista's Medi-Cal beneficiaries had no prior history of using these high-cost drugs.

37.  On November 15 and 16, 2022, DHCS conducted an unannounced onsite visit at Monte Vista.  Based on reports from the onsite visit, I understand that the pharmacy staff present

were C.A., Pharmacy Technician; B.C., Pharmacy Technician; A.M., Clerk; and Mekail, who introduced himself as Pharmacist-in-Charge and Owner.

38.  When asked to explain the billing process, Mekail said that he billed the prescriptions when received.  When asked if he would bill Medi-Cal if he did not have the inventory available, Mekail responded, "Yes."

39.  DHCS collected a sample of prescriptions onsite, which included faxed prescriptions from Anderson.

40.  During DHCS's onsite visit to Monte Vista, auditors observed Mekail making several phone calls to an undisclosed caller in which he would ask the audit team questions and relay the response to the undisclosed caller.  During one instance, one of the DHCS auditors noticed an incoming call from "Paul Randall" on Mekail'S phone.  However, when the auditor asked Mekail who was calling him, Mekail told the auditor that it was his father.[2]

41.  As discussed further below, the auditor's observations are corroborated by phone records for Mekail, which reveal that on November 15 and November 16, 2022 — the dates of DHCS' unannounced onsite visit of Monte Vista — there are a total of 30 calls between Mekail and two numbers associated with RANDALL, of which 15 of these calls were received by Mekail from RANDALL.

---

[2] During a March 14, 2024, proffer-protected interview, Mekail admitted that he was calling RANDALL during the DHCS onsite visit.

On these two dates, Mekail and RANDALL also exchanged 71 text messages.

    5.   <u>Mekail's Statements[3]</u>

    42.  During interviews with law enforcement, Mekail stated the following:

- Mekail met RANDALL in or around March 2022, when RANDALL walked into Monte Vista and introduced himself as someone who could help bring business to the pharmacy.

- RANDALL asked Mekail to try billing a test claim for a specific medication, which Mekail saw reimbursed for approximately $6,000. After the large reimbursement, RANDALL asked Mekail to meet outside the pharmacy.

- RANDALL met with Mekail and a family member outside the pharmacy and offered to be Mekail's consultant to get him additional business. During the meeting, RANDALL showed Mekail a spreadsheet containing reimbursement amounts for

16

certain prescriptions.[4]  RANDALL also discussed with Mekail that RANDALL preferred the pharmacy to mail out the prescriptions rather than deliver them in person.

- Ultimately, RANDALL agreed with Mekail that RANDALL would provide prescriptions to Monte Vista in exchange for 40% of the Medi-Cal profits.

- Through RANDALL, Monte Vista received prescriptions from Anderson and other prescribers that Mekail billed to Medi-Cal.

- Eventually, RANDALL came to Monte Vista everyday with a list of patients and prescriptions that he referred to Monte Vista.  Mekail discussed with RANDALL rejected prescriptions and kickbacks owed to RANDALL.

- RANDALL asked Mekail to pay him through checks to the SOCAL Trust Accounts and Mekail at times paid RANDALL every day

- Mekail identified Anderson as a nurse practitioner that RANDALL used for the prescriptions and stated that RANDALL arranged for Mekail to meet with RANDALL and Anderson at a steakhouse dinner in Los Angeles.  Mekail also said that an individual named C.M.[5] worked for RANDALL as his assistant and helped him with providing prescriptions.

---

[4] A version of this spreadsheet was later found in RANDALL's Tesla ███████████████████████ at his home ████████ ████████████████████████.

[5] I am aware that C.M. is also known as C.H.

6.    <u>Anderson's[6] Statements</u>

43.  As stated above, Anderson was the top prescriber of the Fraud Scheme Medications for Monte Vista.

44.  DHCS's review of the prescription records pulled during the onsite visit showed that all of Anderson's prescription records were either facsimile templates or telephone prescriptions.

45.  During interviews with law enforcement, Anderson stated the following:

- Anderson met RANDALL in 2017 through a colleague who used to work for RANDALL's company, MHS, and the two met at a restaurant to discuss Anderson working for MHS.

- The agreement with RANDALL was that Anderson would be paid to sign prescriptions for MHS.  During the dinner, RANDALL showed Anderson versions of the spreadsheets with patient names and the Fraud Scheme Medications.[7]

- Beginning in 2022, Anderson began writing "concierge" prescriptions for Monte Vista on behalf of MHS.  Some of the prescriptions were for pain cream as well as folite tablets and naproxen.  Anderson met with Mekail and RANDALL for dinner on at least two occasions to discuss the prescriptions.  Anderson understood that RANDALL's assistant, C.M., would send Anderson a list of prescriptions to sign once a week or every other week for these "prescreened patients."  RANDALL told Anderson that these prescriptions were refills.

- Anderson admitted that she would prescribe medications for the "prescreened patients" without seeing or contacting the patient, and without reviewing any of the patients' medical records.

- Anderson would fax the prescriptions to Monte Vista using a prescription form (a prescription "sheet") that was provided to her by MHS (through C.M.).

---

[7] A version of this spreadsheet was later found in RANDALL's Tesla ████████████████████████████████ at his home████ ████████████████████████████.

19

- Initially, Anderson wanted to be paid per patient, but RANDALL told her that she could not be paid per patient because it was illegal.

46. Anderson also provided the government with an unsigned version of a contract between her and MHS, which she received from RANDALL. The contract, dated June 1, 2022, provides that MHS was to pay Anderson a monthly fee of $25,000 for various duties and responsibilities, including for Anderson to "see patients as a Provider in outpatient . . . practice" and provide "health care management, disease prevention and health promotion for her patient base as well as follow up visits." The signatories on the contract are Anderson and A.G., who is listed as the "founder" of MHS, however, it was unsigned by A.G. Anderson confirmed that she never performed any of the duties in the contract and was paid only for the prescriptions. Accordingly, the evidence shows that the contract between Anderson and MHS was intended as a sham agreement to cover up the kickbacks paid to Anderson.

7. <u>Email and Fax Records</u>

47. I reviewed emails ████████████████████ ████████ of RANDALL's and Anderson's Gmail accounts, ████████ ██████████████████████████████████████████ ██████████████████████████. These emails corroborate Mekail's and Anderson's statements regarding the Medi-Cal fraud scheme and RANDALL's role.

48. Emails between RANDALL and C.M. show the two discussing and attaching the prescription order forms that were

sent to Anderson to be used for the fraudulent prescriptions. Other emails show C.M. as well as other patient marketers emailing RANDALL lists of beneficiary information (i.e., Medi-Cal ID #s, addresses, and DOBs), as well as lists with names of the Fraud Scheme Medications and changes made to certain patients' prescription orders.

49.   Email communications between RANDALL, C.M., and Anderson also discuss complaints from Medi-Cal beneficiaries who received the Fraud Scheme Medications despite not wanting or needing the medications, and despite never being evaluated by Anderson.

50.   Emails between RANDALL and Anderson also corroborate the bank records (discussed below) showing kickbacks paid to Anderson through A.G.  For example, in one email, dated August 16, 2022, Anderson emails RANDALL with the subject line "Invoice" and writes in the body of the email "Unpaid".  RANDALL then responds, "bringing check from attorney thurs".  Bank records show that on August 22, 2022, Anderson deposited a $29,000 cashier's check issued by A.G.

51.   In addition, there are over 500 emails between Anderson and C.M. during the time period of March 2021 through November 14, 2023.  These communications largely consist of emails from C.M., on behalf of MHS, sending Anderson the above-described prescription order forms for Medi-Cal beneficiaries, with pre-filled patient names, medications, quantities, and refills and dosages for the Fraud Scheme Medications.

52.   Emails between RANDALL and Anderson also include invoices sent from Anderson and addressed to MHS LLC-Paul Randall, charging $200 per prescription refill, which corroborates Anderson's statements discussed above, and are further evidence of the kickbacks, and that the contract between Anderson and MHS that set forth a monthly flat fee was a sham.

53.   In addition, and as shown in the example below, there are emails from RANDALL requesting Anderson to fax patient sheets to Monte Vista, with Anderson confirming that she has sent the faxes.



54.   A review of email, fax, and Medi-Cal claims records shows that (1) C.M. emailed Anderson prefilled prescription forms for the Fraud Scheme Medications; (2) Anderson added her e-signature to the prescriptions and then faxed them to Monte Vista; and (3) Monte Vista billed Medi-Cal for purportedly dispensing the medication on or around the same day.

//

//

*a.    Beneficiary K.R.*

55.   For example, I reviewed an email from C.M. to Anderson dated October 11, 2022, with the subject line "8 patients" and enclosing prescription order forms for eight Medi-Cal beneficiaries, including for Medi-Cal beneficiary K.R. for the Fraud Scheme Medications.  That same day, Anderson faxed the below signed prescription to Monte Vista for patient K.R.:



8.   <u>Phone Records</u>

56.   I have also reviewed text message communications from RANDALL's phones, which were seized by law enforcement on November 16, 2023,

███████.  The text message exchanges include texts between RANDALL and C.M., whereby RANDALL and C.M. exchange lists of Medi-Cal beneficiaries, as well as copies of drivers' licenses and Medi-Cal identification cards for these individuals.

57.  The text message communications also include texts between RANDALL and C.M. discussing obtaining new patients and prescriptions orders for pharmacies before Medi-Cal resumed its prior authorization requirement for the Fraud Scheme Medications.

58.  The text message exchanges also include texts that I understand to be discussing C.M. sending prescriptions to Anderson for her signature.  Specifically, in an April 6, 2023, exchange, C.M. texted RANDALL that "K I just sent 10 patients to Pattye [i.e., Anderson] to sign", to which RANDALL responded, "Great".

9.  <u>Medi-Cal Beneficiary Interviews</u>

59.  Agents interviewed several Medi-Cal beneficiaries for whom Monte Vista billed for the Fraud Scheme Medications.  This group of individuals — including individuals who had submitted complaints to DHCS regarding Monte Vista — verified Monte Vista's fraudulent billing and dispensing of high-cost generic drugs.

a.  *Beneficiary K.R.*

60.  In May 2023, agents interviewed K.R., a 49-year-old Medi-Cal beneficiary, who stated the following:

a.  in October 2022, K.R.'s friend asked him if he would accept some medical samples.  At the time, K.R.'s friend had

24

been working at what K.R. believed was a dental insurance company and K.R. thought the samples might be dental-related.  K.R.'s friend told him he would be paid $100 for every person he could get to participate in accepting the medical samples.  K.R. initially agreed to accept the samples to help out his friend, but K.R. was then informed that he was "not qualified" to accept the samples because his Veterans Affairs ("VA") health insurance conflicted with receiving medical samples.

      b.    However, after K.R. initially agreed to accept the samples, he began to receive spam e-mails and a package in the mail containing ten medical pain patches.  The package label contained the name "Dr. Patricia Anderson" and various numbers. When K.R. called the pharmacy to inquire about the package, the pharmacy employee informed K.R. that there were five medications in their system that were listed as prescribed to him, and that insurance was going to be billed for the medications.

      c.    K.R. called the pharmacy several more times and was either put on hold or told that the pharmacy manager would call him back.  K.R. never spoke with or received a call back from the manager.  While K.R. could not recall the name of the Montclair pharmacy at the time of the investigative team's interview, during a previous interview with the DHCS in January 2023 regarding this matter, K.R. provided DHCS with a prescription label of Synoflex, which listed Monte Vista Pharmacy, as well as "Patricia Anderson APRN" as the prescriber.

    61.  An example of a claim submitted by Monte Vista for one of the Fraud Scheme Medications prescribed by Anderson and

purportedly dispensed to K.R. is shown below.  As discussed
above in paragraph 55, on October 11, 2022, C.M. emailed
Anderson a prescription form for K.R. for the below medication
as well as several other Fraud Scheme Medications, which
Anderson faxed to Monte Vista that same day.  Medi-Cal claims
data shows that Monte Vista submitted claims for seven other
Fraud Scheme Medications purportedly dispensed to K.R. the same
day.  As noted above, K.R. stated he did not need any of the
medication and did not know the prescriber Anderson:

| DATE | BENEF-ICIARY | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|------|------|------|------|------|------|
| 10/11/22 | K.R. | 512504 79201 | Meloxicam 5 mg capsule | Anderson | $13,424.45 |

   *b. Beneficiary H.L.*

  62.  Medi-Cal beneficiary H.L. was interviewed on July 10,
2023.  H.L. stated about a month after going to urgent care to
get a cyst removed, he started receiving medication from Monte
Vista Pharmacy sent to him by mail.  Most of the medication was
creams such as Lidocaine.  H.L. did not need any of the
medication and never used any of it.  H.L. had never heard of
Anderson.

  63.  Agents took photos of the taken of the medications
sent to H.L. by Monte Vista Pharmacy, as shown in the photo
below:



64.  Monte Vista submitted the following claims to the Medi-Cal for Fraud Scheme Medications allegedly dispensed to H.L. on September 16, 2022.

| DATE | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|---|---|---|---|---|
| 9/16/22 | 59088043005 | Lidocort 3-0.5% Cream | Anderson | $4,142.79 |
| 9/16/22 | 59088043005 | Lidocort 3-0.5% Cream | Anderson | $4,142.79 |
| 9/16/22 | 59088046607 | Dermacinrx Lidogel 2.8% Gel | Anderson | $11,379.99 |
| 9/16/22 | 59088037107 | Lidotral 3.88% Cream | Anderson | $10,798.54 |
| 9/16/22 | 68180018806 | Meloxicam 5 Mg Capsule | Anderson | $13,424.45 |
| 9/16/22 | 70512001515 | Synoflex 4%-5% Patch | Anderson | $5,716.51 |

| DATE | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|------|-----------|------------|------------|-----------------------|
| 9/16/22 | 50991097730 | Folite Tablet | Anderson | $25,793.62 |
| 9/16/22 | 15370018060 | Lofena 25 Mg Tablet | Anderson | $8,371.31 |

10.    Interviews with Former Monte Vista Employees

65.    The investigative team interviewed several former employees of Monte Vista who, as stated below, identified RANDALL as an almost daily visitor to Monte Vista. According to the former employees, RANDALL would show up to Monte Vista with a folder containing patient information and would meet with Mekail for hours in his office. Several former employees understood that the patients on RANDALL's list came from various facilities. According to the former employees, RANDALL drove a black Tesla.[8] The former employees all stated that they would receive complaints from individuals who were receiving prescriptions from Monte Vista that they did not want and were not prescribed.

a.    A.R.G.

66.    In July 2023 and September 2023, agents interviewed A.R.G., who stated the following:

a.    A.R.G. began working as a pharmacy technician at Monte Vista in June 2022.

---

[8] Records obtained from the California DMV revealed a black 2018 Tesla, bearing California license plate ███████ is registered to M██ R████. During this investigation, I learned that M██ R████ is RANDALL's son. The Black Tesla was seized ███████████████████████████████████.

b.    A.R.G. received daily calls from people complaining about prescriptions that were sent to them.  Many of the complaints pertained to prescriptions written by Anderson. The callers did not know who Anderson was, nor had they had appointments with Anderson on the dates indicated on their prescription.  The callers had never heard of Monte Vista.

c.    An older white male with the first name of "Paul" visited the pharmacy at the end of the workday for approximately three hours at least two to three times per week.  "Paul" was bald, wore gym clothes, and drove a black Tesla.

d.    Mekail referred to "Paul" as his friend, and Mekail billed Paul's patients.

e.    On a weekly basis, Monte Vista received approximately four to six UPS boxes, which the pharmacy clerks unpacked.  The boxes contained Lidocaine ointment, Folite tablets, and Meloxicam.  A.R.G. stated that some of these medications were sent to "Paul" and Anderson's patients.  Mekail instructed A.R.G. and the other technicians to set the labels aside for his, "Paul's," and Anderson's prescriptions.  A.R.G. placed labels for these prescriptions in a plastic basket. Mekail also had lists of drugs posted on a wall, indicating the drugs to order for his, "Paul's," and Anderson's patients.

f.    "Paul's" and Anderson's patients were the same patients, as all of the prescriptions for "Paul's" patients listed Anderson as the prescriber.

g.    The list of medications was taken down right before a Pharmacy Board inspection/audit.  Either Mekail took the

29

list down or instructed someone else to take it down because he told the staff that the list should not be up for the Pharmacy Board inspection/audit.

h.   A.R.G. knew that the medications on this list made more money for the pharmacy as they paid more.  A.R.G. knew this by observing and could easily see the numbers and net profit from these medications.

b.   N.S.

67.   In May 2023, agents interviewed N.S., who stated the following:

a.   N.S. worked as a pharmacy technician extern at Monte Vista from May 2022 to August 2022.  N.S. and N.S.'s colleagues would receive daily calls from individuals who stated that they were receiving medications from Monte Vista but did not have prescriptions for the drugs.  The callers stated that they were not familiar with Monte Vista and did not recognize the prescribing doctor whose name was listed on the drugs they had received.  After receiving these complaint calls, N.S. and N.S.'s colleagues would inform the pharmacy owner Mekail, who advised N.S. that he would call the people back.  N.S. assumed Mekail did not call the individuals back as he said because the same people repeatedly called Monte Vista with the same complaints.

b.   N.S. observed that an older white male, whose first name was "Paul," would come to Monte Vista every day between 4:00 p.m. and 5:00 p.m. and stay approximately one to one-and-a-half hours speaking with Mekail in Mekail's office at

the back of the pharmacy.  N.S. was aware that "Paul" drove a black Tesla.

      c.  N.S. observed at the beginning of every week, Monte Vista received 15-20 large FedEx shipment boxes containing prescription medications, which Mekail indicated were for Mekail's and "Paul's" patients.  Mekail trained Monte Vista's lab clerks to print out the lists of his and "Paul's" patients, who were the intended recipients of the medications.

      11.  <u>Financial Analysis</u>

      *a.  Monte Vista's Financial Transactions with RANDALL*

      68.  As set forth below, bank records show that fraud proceeds were transferred from Monte Vista to the SOCAL Trust Accounts, which were established for the benefit of RANDALL, with K.J. named as the trustee.

      69.  A business checking account ending in X5190 for Monte Vista was opened on September 8, 2022, at Wells Fargo Bank with Mekail as the sole signatory ("Monte Vista Account 1").[9]  Bank records show that Medi-Cal paid Monte Vista for prescriptions billed to Medi-Cal by depositing funds into Monte Vista Account 1.

      70.  A separate business checking account for Monte Vista (ending in X5458) was opened previously on May 5, 2021, at Bank of America with Mekail, his mother, and father as signors on the account ("Monte Vista Account 2").  Bank records show that Medi-

---

[9] Mekail's mother was added as a signor on November 10, 2022.

Cal paid Monte Vista for prescriptions billed to the Medi-Cal program by depositing funds into Monte Vista Account 2.

71.  Records obtained from Wells Fargo Advisors revealed an account was opened by an individual named K██████ J████████ ("J███████") on or about November 18, 2022, in the name of SOCAL Family Irrevocable Inves Tr, ending in X4338 ("SOCAL WFA X4338").  Documents submitted to Wells Fargo Advisors identify J███████ as a signatory and the trustee of the account.  In addition, J██████ submitted a document titled Trustee Certification of Investment Powers which identified "Richard Paul Randall" (which I submit refers to RANDALL) as the "grantor, settlor, or testator" who established SOCAL Trust on or about May 15, 2020.

72.  Bank record analysis revealed that, beginning in May 2022, and continuing through January 2023, Mekail issued checks from Monte Vista Account 1 and Monte Vista Account 2 payable to SOCAL Trust totaling over $32 million, which were deposited into the SOCAL Trust Accounts.  The payments were largely in the form of checks with the memo line "consulting services."  The monies funding the payments from Monte Vista to the SOCAL Trust Accounts were derived from the fraudulent Medi-Cal billing scheme at Monte Vista.

    b.   *Kickback Payments to Anderson*

73.  A review of bank records reflected that on July 14, 2022, a SOCAL Trust Account transferred $7,500 with the notation "Anderson check," to an account held by J██████ in the name of

RPI Mortgage.  That same day, J█████ wrote a check to Anderson for $7,500.

74.  In addition, a review of records for the Anderson BofA accounts showed that from February 2022 through May 2022, Anderson received $6,500 in Zelle transfers from J█████.

75.  On November 16, 2023, J█████ was interviewed and stated the following:

a.    J█████ manages and sets up trusts for different people, and is added as a trustee to help manage different financial aspects of the trust.  His job responsibilities include balancing the bank accounts for the trusts he manages.  He has been managing trusts for approximately 35-40 years.

b.    J█████ has been the managing trustee for the SOCAL Trust Accounts since 2020.  J█████ recognized RANDALL's name; he first met RANDALL in 2020 after being introduced by an old business partner to RANDALL as someone who could help manage business accounts.  J█████ serves as the trustee of RANDALL's trust, SOCAL Trust.  Although RANDALL is listed as the trustor of SOCAL Trust, J█████ manages the bank accounts and reviews the balances for the SOCAL Trust Accounts.  Beyond managing the bank accounts for SOCAL Trust, J█████ does not have any other financial dealings with RANDALL.

c.    J█████ communicated with RANDALL a "couple of times" throughout the day; J█████ called RANDALL every morning to give him updates on the SOCAL Trust Accounts.

d.    J█████ and RANDALL would at times meet in person for lunch, where RANDALL would instruct J█████ on

33

withdrawing money from the SOCAL Trust Accounts and directing him to use those funds to pay different people.

    e.   J█████ had signatory authority over the SOCAL Trust Accounts at Wells Fargo Bank and personally signed checks and/or obtained cashier's checks for payments under the direction of RANDALL.

    f.   J█████ believed RANDALL was a marketer for different pharmacies. J█████ said the name of the pharmacy was "Montezuma," but then confirmed the name of the pharmacy was Monte Vista.

    g.   A.G. was RANDALL's attorney. J█████ did not know how much money RANDALL had paid A.G. over the course of their relationship, and the money varied from season to season. J█████ did not know the purposes of the payments to A.G. All payments from the SOCAL Trust Accounts were at the direction of RANDALL.

    h.   J█████ was familiar with Anderson and met her at a function held at a house that had been acquired by SOCAL Trust. J█████ was not sure what Anderson did for work. At times he would buy Anderson tickets to different sporting events at the direction of RANDALL.

    i.   When asked about the Zelle transfers in February to May 2022 with the notation "Anderson check" from a SOCAL Trust Account to an account in the name of J█████ company, RPI Mortgage, and then a subsequent check for $7,500 written by J█████ from the RPI Mortgage account to Anderson, J█████ said he could not recall the transactions, but that all payments

to Anderson were made under RANDALL's direction; he believed the payments were associated with "some sort of networking."

76.    A review of records for the Anderson BofA accounts shows that from July 2022 through May 2023, Anderson also received over $275,000 from RANDALL's attorney A.G. Specifically, Anderson received $197,500 in checks issued from an account in the name of A.G.'s law firm and $79,000 in checks from A.G.'s personal bank account.    The source of funds for the majority of these checks can be traced to checks and wire transfers to A.G. from the SOCAL Trust Accounts.

12.    ████████████████████

77.    ████████████████████████████

████████████████████████████████████████

██████████████████████████████████.

At RANDALL's residence, law enforcement searched a black Tesla registered to M██ R██████, who during this investigation I learned to be RANDALL's son, and found items inside the Tesla, including: (a) Wells Fargo Debit Cards in RANDALL's name and K.J.'s name connected to the certain SOCAL Trust Accounts; (b) pre-signed blank checks from certain SOCAL Trust Accounts; and (c) spreadsheets containing columns including patient name, associated Fraud Scheme Medication, medication quantity, "InsPaid" amount, and status as to whether the prescription was billed, not billed, or rejected.

## V.    CONCLUSION

78.    For all the reasons described above, there is probable cause to believe that in the Central District of California and

elsewhere, RANDALL, Mekail, Anderson, and others, did knowingly and willfully execute and willfully caused to be executed a scheme to defraud Medi-Cal by submitting and causing to be submitted false and fraudulent claims for prescription medications that were not medically necessary, not dispensed to Medi-Cal beneficiaries, and/or were procured by kickbacks, namely, RANDALL submitted and caused the submission of following false and fraudulent claim to Medi-Cal:

| DATE | BENEF-ICIARY | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|------|--------------|-----------|------------|------------|------------------------|
| 10/11/22 | K.R. | 512504 79201 | Meloxicam 5 mg capsule | Anderson | $13,424.45 |

79.  Thus, there is probable cause for the requested complaint and arrest warrant for RANDALL for committing a violation of 18 U.S.C. § 1347 (health care fraud).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  17th day of June, 2025.

_Patricia Donahue_

HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE